| | | |
|---|---|---|
| UNITED STATES DISTRICT COURT | | SOUTHERN DISTRICT OF TEXAS |

| | | |
|---|---|---|
| The United States of America, | § § § § § § § § § | |
| Plaintiff, | | |
| versus | | Civil Action H-14-3440 |
| $8,000 in Currency, | | |
| Defendant. | | |

## Opinion on Forfeiture

1. *Introduction.*

The government has converted the temporary air-safety inspection into a search for crime in general. It may not assume facts to support its seizing $8,000 from a law-abiding man. It says that it is money from a drug deal and that the man was a courier. Because the government has no facts – nothing – from which the agents could have reasonably concluded that the money was the proceeds of a drug deal, much less that the passenger was a courier, it will be returned to the citizen.

2. *Background.*

On July 18, 2014, Ryan Lorenzo Barnes was traveling by air from Orlando, Florida, to San Jose, California – a domestic flight. He landed at Houston's George Bush Intercontinental Airport to change planes for San Jose.

Before he arrived, the Drug Enforcement Administration told local police about a possible courier traveling from Orlando to San Jose with drugs or money. This was the data. No name, description, flight, or looks. Nothing. Orlando has 2.3 million people living there, and its airport handles 37 million passengers a year. San Jose has 1.4 million residents, and its airport handles nearly one million passengers a year.

When Barnes stepped off the plane in Houston, officers of the Houston Police Department's High Intensity Drug Trafficking Area Task Force were waiting. The officers

asked him for his boarding pass. Barnes gave it to them. The officers then asked for his identification. Barnes produced it. The officers asked if he had drugs or money with him. He said that he did not have drugs but that he had around $7,000. The officers then asked him to come with them to their office in another terminal. Barnes complied.

The police say that during this initial colloquy, Barnes became very nervous. They say that his hands shook; he would not maintain eye contact with them; he fumbled with his wallet in getting his identification.

In their office, the police interrogated Barnes. They asked him why he was traveling to San Jose. The officers say that he first told them that he was going to visit his sister, whose address he did not know. Later he said that he was going to a party and that he would use the money for it. The officers say that he did not know the occasion for the party. Finally he told the officers that he was going to buy a wrecker with the money.

The officers searched their databases for Barnes's criminal history. They learned that he had been arrested three times on drug charges. The officers then called for a dog to check the backpack. The dog alerted. The officers searched his backpack and found $8,000 but no drugs. The government kept Barnes's $8,000 and sent him on his way. It says that the money was traceable to a drug deal. It has asked the court to forfeit the money.[1]

3.  *Forfeiture.*

The government says that Barnes's money should be forfeited because it is traceable to an exchange for a controlled substance.[2]

When pressed, the government could not identify a single transaction to which the money was connected. A bureaucratic tip that it was possible that a courier would be traveling from Orlando to San Jose may be true – may be true everyday. It is not a shadow of evidence that Barnes was one. The tip did not identify anyone with specificity and clearly not Barnes. It described his itinerary. It did not identify a specific transaction that involved his money. It amounted to nothing more than the officers' bare assertion that the money was drug proceeds.

The only fact that could connect the money to drugs is the alert by the dog. The alert, however, is worthless. Most currency in the United States – 92% – has traces of controlled

---

[1] 18 U.S.C. § 981.

[2] 21 U.S.C. § 881.

substances. It has trace drugs because a little money that may have been part of a drug deal gets deposited with other cash; when the tainted bills are sorted and counted, they leave traces of drugs on the machine. A bartender who sells a drink to someone with tainted bills mixes them with his other cash. The dog's alert only tends to show that the currency had been in circulation.[3] The dog's reliability was not established.

The government makes much of Barnes's demeanor and inability to give acceptable answers to its questions. This too proves little. Being nervous when ambushed by several officers is normal. It would be remarkable if Barnes were calm. That he did not maintain eye contact proves nothing. The officers would just as likely have pointed to his maintaining eye contact and watching them closely as evidence of his guilt.

Beyond his name, Barnes was not obliged to tell the officers anything. He could have kept quiet or told them that he was traveling to the moon to buy his cat a birthday present. Though he likely did not think himself able, Barnes could also have declined to speak with the officers and continued to his connecting flight. It makes no difference. Inconsistent or incredible explanations for his travel do not show that the money was connected to drugs or that he is a courier of drugs or money.

The tip did not hint at a name for the courier. Once Barnes told them his name, they looked on their computers to discover that he had been convicted of drug crimes. His record is not present data to support an arrest or a seizure. His confused, even evasive, answers do not justify his detention or keeping the money. He is not obliged to have a reasonable explanation of his life available for the police. He gave them his name, an identity card, his boarding pass, and told them about the money. They sicced the dog on his money. They took him to a remote place for this additional interrogation. Barnes had a flight to catch. If they caused him to miss it, they were not going to help him explain it to the airline.

The most damning evidence of his money's guilt is the fact that after the police had seized it, they let Barnes go. He was never connected to a drug deal. They did not give him so much as a warning – no citation, arrest, charge. They did not call the DEA, San Jose police, or others to tell them what had happened or to keep an eye on Barnes. They were content with his money.

---

[3] Amanda J. Jenkins, *Drug Contamination of US Paper Currency*, 121 Forensic Sci. Int'l 189 (2001).

The intrusions of the Transportation *Safety* Administration are constitutionally tolerable only temporarily and only for defense against terrorism. The DEA and local police turn the safety-check opportunity into a general inquiry for crimes. TSA has no legitimate interest in whether or how much money passengers have – neither does the Houston Police.

The government's actions resemble those of common brigands preying on people who use airways. No, the officers do not keep the money; their reward is the booty of approval, assignments, and promotion. The Drug Enforcement Administration may bureaucratically disburse forfeited money to cooperative police departments. Seizing property and then, at significant cost, obliging its owner to prove a negative to reclaim what all along is legally his.

4.  *Posture.*

The government initially sought to forfeit Barnes's money administratively. Barnes claimed the money. Before it sued here, the government asked Barnes, through his lawyer, to answer questions, including – among several others – details about his supposed purchase of a wrecker, why he wanted to buy one in San Jose instead of Orlando, and why he was going to pay in cash instead of a certified check. The government simply has no business asking these questions. It must show that the money may be forfeited, not force Barnes to explain his preference for a particular medium of exchange.

After Barnes did not answer, the government sued here. The government published notice of this suit on its website, www.forfeiture.gov. The website – one of seven maintained by the government for this purpose – is a little-known, unreadable list of funds and dates. It has more than seven hundred pages of listings. It did not, however, notify Barnes directly.[4] When the government takes property from a person, it must take enough data from him to enable it to notify him when it decides to keep his money. This the government usually avoids doing. Seized money is not abandoned or unclaimed; it is a known person's stuff. The process that is due Barnes is notice and an opportunity to be heard.[5] Barnes has not appeared and has not claimed the money here – proof of the efficacy of the notice by publication. Perhaps, as the officers knew, the cost of his hiring a lawyer or coming back or both would exceed the value of

---

[4] Supp. R. (G)(4)(b)(i).

[5] United States v. James Daniel Good Real Property, 510 U.S. 43, 48 (1993); Grannis v. Ordean, 234 U.S. 385, 394 (1914).

the money. Police work has generated an expression: You can beat the rap but you can't beat the ride. Lawmen of integrity and courage are having their character subverted by a management too eager for statistics, press, budgets, and corner-cutting.

Nevertheless, the court is obliged to ensure that the government does not abuse its power. Because the government has not given facts from which the court might reasonably conclude that Barnes's money was probably connected to a drug transaction, the court will dismiss the government's complaint on its own motion.

5.  Conclusion.

The government had no justification for having seized Barnes's money. This case is a telling example of overzealous policing, taking cues from slipshod sister agencies. The police have a hard job. The Constitution commands that they do their work correctly. Government may not become banditti for law and order.[6] The money will not be forfeited. The government must return the money to its legal owner, Ryan Lorenzo Barnes.

Signed on August 26, 2015, at Houston, Texas.

Lynn N. Hughes
United States District Judge

---

[6] Leonard W. Levy, *A License to Steal: The Forfeiture of Property* (1995).